FILED ___ ___ RECEIVED
ENTERED ___ ___ SERVED ON
COUNSEL/PARTIES OF RECORD

MAR 18 2008

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY: _____ DEPUTY

1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8  GEO-ENERGY PARTNERS - 1983 LTD.,      )        3:06-cv-00612-BES-RAM
                                         )
9            Plaintiff,                   )
                                         )
10      v.                                )        **ORDER**
                                         )
11  DIRK KEMPTHORNE, IN HIS CAPACITY      )
    AS SECRETARY OF INTERIOR, UNITED      )
12  STATES DEPARTMENT OF THE              )
    INTERIOR; RONALD WENKER, IN HIS       )
13  CAPACITY AS DIRECTOR OF THE           )
    NEVADA STATE OFFICE, BUREAU OF        )
14  LAND MANAGEMENT, UNITED STATES        )
    DEPARTMENT OF THE INTERIOR,           )
15                                        )
             Defendants.                  )
16  _____

17          Currently before this Court is Plaintiff Geo-Energy Partners-1983 LTD.'s ("Geo-Energy")

18  Motion for Summary Judgment (#20), filed on July 12, 2007. Defendants Dirk Kempthorne

19  and Ronald Wenker, in their respective official capacities ("Defendants"), filed an Opposition

20  and Cross-Motion for Summary Judgment (#21/22) on September 7, 2007. The Court has

21  also considered Geo-Energy's Reply (#24), filed on November 7, 2007, and Defendants' Reply

22  (#28) filed on January 16, 2008.

23                              **BACKGROUND**

24          This case involves an appeal of a decision issued by the Interior Board of Land Appeals

25  ("IBLA") on September 14, 2006. (Complaint (#1) at p. 2). That decision upheld a May 12,

26  2003 decision by the Bureau of Land Management ("BLM") which contracted a geothermal

27  lease arrangement called the Fish Lake II Unit ("Unit") to the boundaries of the Unit's

28

1   Participating Area.[1]  Id. at pp. 2-3.  As a result of this contraction, several geothermal leases
2   held by Geo-Energy were left outside of the newly configured unit.  The BLM further
3   determined that the leases located outside the newly-configured unit had all expired following
4   contraction and were no longer in effect.  Id. at p. 3.  Moreover, the BLM determined that the
5   leases were not individually eligible for further extensions.[2]  (Cross-Motion for Summary
6   Judgment (#21/22) at p. 3).  Following the IBLA's decision affirming the BLM's decision, Geo-
7   Energy filed a complaint in this Court seeking judicial review of the IBLA decision.[3]

8        The Geothermal Steam Act of 1970, as amended, 30 U.S.C. §§ 1001-1028 (the "Steam
9   Act") provides for specific lease periods for geothermal leases on federal land.  The Steam Act
10  includes a primary lease term and provides for various extensions.  The primary term of a
11  federal geothermal lease is ten years.  30 U.S.C. § 1005(a).  A lease may be extended after
12  its primary term for various five year extensions.  30 U.S.C. § 1005(c) and (g).  Specifically,
13  a lease can be granted extensions for "successive 5-year periods" if the lessee has met the
14  bona fide effort requirements of the statute.  30 U.S.C. § 1005(g).  There are several federal
15  regulations which must be followed in seeking extensions under the Steam Act.  See 43 C.F.R
16  § 3200.1 et seq.

17       The leases committed to the Fish Lake II Unit were issued pursuant to the Steam Act.

18

19  _____

[1]  The Fish Lake II Unit was an area composed of multiple geothermal leases which were located
20  in the same geographic area.  In general, when exploring, developing, and producing geothermal
    resources, lessees commonly join their geothermal leases into such a unit through a unit agreement.
21  (Cross-Motion for Summary Judgment (#21/22) at p. 11).  The joined leases then are considered part
    of a unit area. If a well within the unit area is determined to be capable of production or utilization in
22  commercial quantities of a geothermal resource, then a participating area is created within the unit area.
    Id.  The participating area, which must be approved by the BLM, is a subset of the unit area which is
23  reasonably proven to be commercially productive.  Id.  In this case, the Fish Lake II Unit initially
    comprised approximately 25,000 acres.  Id. at p. 11 n.4.  The participating area, on the other hand, was
24  comprised of approximately 4000 acres.  Id.

25  [2]  There are 12 specific leases at issue in this matter.  Following contraction, seven geothermal
    leases located wholly outside the newly configured unit were determined to be expired.  These leases
26  included N-10311, N-17777, N-31992, N-36616, N-36617, N-36618 and N-36619.  The contraction also
    eliminated portions of five other leases which were partially located outside the newly configured unit.
27  These leases included N-8421, N-8428, N-9647, N-31991 and N-31993.

28  [3]  Neither party disputes the statement of facts as recited by the IBLA.  As such, numerous facts
    regarding the background of this case have been recited from that opinion.

2

1   Three leases at issue in this appeal, N-8421, N-8428, and N-10331, were issued by the BLM

2   in 1975. (Motion for Summary Judgment (#20) at p. 10). In 1978, lease N-17777 was issued.

3   Id. On September 1, 1981, the BLM issued three additional leases: N-31991, N-31992 and

4   N-31993. Id. The final four leases were issued a year later. These leases included N-36616,

5   N-36617, N-36618 and N-36619.  Id.

6        In January 1987, following the expiration of the primary term, BLM extended leases

7   N-8421, N-8428, N-8429, N-9647, N-10311 and N-17777 through December 31, 1988, via an

8   Interior Department appropriations bill legislatively authorizing extensions of geothermal leases

9   meeting certain criteria. (Motion for Summary Judgment (#20) at p. 10)(IBLA Decision at p.

10  3)[4]. On February 10, 1989, a diligent efforts extension under the Act was granted, extending

11  those five leases through December 31, 1993. Id.

12       By decision dated August 19, 1991, BLM granted a first diligent efforts extension

13  through August 31, 1996, for leases N-31991, N-31992 and N-31993. Id. On October 15,

14  1992, the BLM granted diligent efforts extensions for leases N-36616, N-36617, N-36618 and

15  N-36619, through September 30, 1997. Id.

16       In the meantime, in 1992, Geo-Energy and Magma Power Company ("Magma") formed

17  Magma/GEO-83 JV (the "JV"), and on August 31, 1992, aggregated their leases to form a unit

18  and executed the Fish Lake II Unit Agreement ("Unit Agreement")[5].  (Motion for Summary

19  Judgment (#20) at p. 11).  Under the Unit Agreement, FLPC, a Magma subsidiary, was

20  designated as the Unit Operator. (IBLA Decision at p. 3). The JV was designated the working

21  interest owner, but all the rights and responsibilities for Unit operations were delegated to

22  FLPC. Id.  Article IV of the Unit Agreement provided for the contraction and expansion of the

23  unit area. (Administrative Record ("AR") Vol. III, Tab DL). Specifically, that article provided

24

25        [4] The IBLA Decision is attached as Exhibit 1 to Geo-Energy's Complaint (#1).

26        [5] The Unit Agreement determines how the Unit will be administered including, when the Unit
27  Agreement is effective, when it will contract or expire, who is the Unit Operator, the size and
    configuration of the Unit Area, what diligent drilling requirements will be for the Unit Area, when a
28  Participating Area will be established, and how the BLM will administer the Unit based on drilling
    operations. (Cross-Motion for Summary Judgment (#21/22) at p. 10).

1   for automatic contraction 5 years after the initial participating area was established "unless
2   diligent drilling operations were in progress on an exploratory well on said fifth anniversary."
3   Id. Under Section 4.3 of the Unit Agreement, all leases or portions of leases not entitled to be
4   included within the participating area as of the fifth anniversary of the effective date of the
5   establishment of the initial participating area would be automatically eliminated from the unit
6   unless diligent drilling operations were underway on an exploratory well. If diligent drilling was
7   in progress on the anniversary date, the lease would remain in the unit "for as long as
8   exploratory drilling operations are continued diligently with not more than four (4) months time
9   elapsing between the completion of one exploratory well and the commencement of the next
10  exploratory well." Id. As such, the working agreement between FLPC and Magma/Geo-83 JV,
11  which was approved by the BLM, provided for automatic contraction of the Fish Lake II Unit
12  five years after a participating area was established.

13        In September 1993, Magma requested a second diligent efforts extension for leases
14  N-8421, N-8428, N-9647, N-10311 and N-1777. That request was granted on November 3,
15  1993, thereby extending those five leases through December 31, 1998. (Motion for Summary
16  Judgment (#20) at p. 11).

17        On March 3, 1994, the BLM determined that the Unit had met its initial diligent
18  development obligation by drilling a well (No. 81-13 on lease N-9647) capable of producing
19  geothermal resources in paying quantities.   Id.   The BLM made the commerciality
20  determination retroactive to December 31, 1993, and extended the lease term for N-9647. Id.
21  Specifically, under 30 U.S.C. § 1005(a), the presence of a well capable of producing the
22  geothermal resource qualified the lease for continuation for a period not to exceed 40 years.
23  Moreover, following the commerciality determination, the BLM declared that all the leases
24  committed to the Unit were held by production as a result of commercial production from well
25  No. 81-13. In addition to the foregoing, the BLM warned that, on the fifth anniversary after
26  December 1, 1993, the date lease N-9647 was established as the initial Participating Area, all
27  participating leases within the Unit area would be automatically eliminated unless diligent
28  operations were in progress. (AR Vol. III, Tab CR). Accordingly, the decision extended leases

4

1  N-31991, N-31992, N-31993, N-36616, N-36617, N-36618, N-36619, N-38842, N-38844, N-
2  39467, N-39468 and N-39469 through November 30, 1998. Id. Other leases were not
3  extended because they had been granted either an initial extension (leases N-38412, N-
4  38413, N-38415 and N-38843) or a second extension (leases N-8421, N-8428, N-8429, N-
5  9647, N-10311 and N-17777) by the November 3, 1993 decision. Id. The BLM determined
6  that, "[a]s a result of that decision, all of the expiration dates of the extended leases will equal
7  or exceed the five year extension afforded by the commencement of production." Id. The
8  decision listed all the leases by serial number, their effective and expiration dates, as then
9  extended, and their current status following the September 21, 1994 decision.

10  Although December 1, 1993, was the date on which lease N-9647 was established as
11  the initial Participating Area, the date of the establishment of the Participating Area was later
12  changed to an effective date of May 1, 1995. Lands within the Participating Area were
13  declared subject to royalty, while lands outside the Participating Area were declared subject
14  to rental. In a letter to Geo-Energy's counsel, Mr. Robert Conover, the BLM specifically stated
15  the effect of the commercial well determination on the leases located within the Participating
16  Area. (AR Vol IV, Tab 15, Dec. 5, 1997 letter, Appendix B to May 12, 2003 Decision).
17  Specifically, that letter stated:

18  Since a commercial well has been completed on a lease committed to the unit,
    all leases committed to the unit will remain in effect as long as they remain part
19  of the unit. All leases in the [Participating Area] or portions of leases within the
    [Participating Area] are in additional term and are paying minimum royalty rather
20  than rental, so they will remain in effect after unit contraction. Leases will be
    segregated when unit contraction occurs. Any leases, or portions of leases,
21  outside the [Participating Area] will remain in effect after the unit contraction date
    only if provided by their individual lease terms. Possibilities for leases to then
22  remain in effect include: 1) the lease is still in its primary period, 2) drilling occurs
    within the unit over the end of the primary period of any lease committed to the
23  unit, or 3) a five-year extension of lease terms is requested for any lease by the
    end of its primary period or any other extension. To obtain such an extension,
24  the request must meet the informational requirements found at 43 CFR 3203.1-
    4(c) and be received by this office at least 60 days prior to unit contraction.
25  Since this extension may be granted for successive five-year periods, any lease
    which has already received either the first or the second extension is not eligible
26  for another such extension. Any lease outside the [Participating Area], beyond
    its primary period, and not receiving any extension of its individual terms, will
27  terminate upon contraction of the unit. It is likely that some involved leases
    already have received at least one-five year extension and so would expire
28  unless additional drilling occurs prior to unit contraction.

5

1  Id.  As such, Geo-Energy was aware, as of December 5, 1997, that the BLM intended to
2  contract the Unit according to the Unit Agreement and that some of the leases would be
3  expired.

4           On June 3, 1999, FLPC submitted its resignation as the Unit Operator for the Fish Lake
5  II Unit.  In response, Geo-Energy designated Fish Lake Green Power Company ("FLGPC") as
6  the new Unit Operator on April 27, 2000, and proposed a $50,000 bond.  (IBLA Decision at
7  p. 6).  At Geo-Energy's request in letters dated April 28 and May 11, 2000, and based on Geo-
8  Energy's representations regarding its plan to acquire a new working interest owner and unit
9  operator, and initiate exploration and development on leases outside the Participating Area
10 but within the Unit, the BLM postponed the scheduled Unit contraction date of May 1, 2000.
11 (IBLA Decision at p. 6)(AR Vol. III, Tabs BY, BS, BP and Vol. II, Tab BK).  On May 25, 2000,
12 the BLM agreed to postpone the Unit contraction until April 30, 2001, provided Geo-Energy
13 met certain conditions.  (IBLA Decision at p. 6)(AR Vol. II, Tabs BJ and BK).  Despite this
14 extension, on April 12, 2001, the BLM expressed continued concerns regarding the lack of
15 diligent development in the Unit area, the lack of new geologic information, and the need for
16 Geo-Energy and FLPC to resolve their dispute in order to avoid Unit contraction to the
17 Participating Area.  (IBLA Decision at p. 6)(AR Vol. II, Tab AL).  In response, Geo-Energy
18 wrote to the BLM with a request that the BLM take no action to revise or contract the Unit area
19 while Geo-Energy and Magma negotiated a sale of Magma's interest to another Nevada
20 geothermal operator ORMAT.  (IBLA Decision at p. 6)(AR Vol. II, Tab AK).

21          In a letter dated November 7, 2001, the BLM wrote to Vincent Signorotti and stated that
22 "[d]uring the past two years, this office has met with you several times to discuss options for
23 facilitating the development of the Federal geothermal resource in Fish Lake." (AR Vol. II, Tab
24 AE).  The BLM further stated that "[d]uring these meetings, we agreed to the granting of
25 several extensions of the contraction terms (Article 4.3) of the Fish Lake II Unit Agreement so
26 that various companies involved would have sufficient time to negotiate business
27 arrangements."  However, according to the BLM, the BLM was informed that the companies
28 were not able to reach an agreement, and because of that it appeared unlikely that "the

1   required diligent development of the Fish Lake II Unit area would occur in a timely fashion."

2   As such, the BLM stated it would contract the Unit effective December 15, 2001. Id. Further,

3   the BLM noted that such contraction would cause many of the leases to expire.

4          At FLPC's request, the BLM again agreed to postpone contraction until March 1, 2002,

5   to allow negotiations with ORMAT to continue.  (IBLA Decision at p. 6)(AR. Vol II, Tabs AD

6   and AC).  Negotiations with ORMAT eventually failed.

7          In addition, in November 2002, Geo-Energy advised the BLM that Geo-Energy and

8   Magma/Cal Energy had executed a stipulation and that Magma had agreed to transfer all

9   leases to Geo-Energy.  Geo-Energy thereafter submitted letters dated April 24, April 25 and

10  May 7, 2003, seeking approval of lease extensions, lease assignments, a well plugging and

11  abandonment plan, and a $50,000 bond.  On May 12, 2003, the BLM issued a decision

12  contracting the Unit to the Participating Area and determining that the leases eliminated from

13  the contracted Unit were ineligible for extensions either because they had already received two

14  successive extensions or because a second extension would not be successive to the first.

15  (IBLA Decision at p. 8)(AR Vol. IV, Tab 15).  Geo-Energy appealed this decision to the IBLA

16  which rendered a decision affirming the BLM's actions.  Geo-Energy has now sought judicial

17  review of the IBLA decision.

18                                              **ANALYSIS**

19  **A.    Standard of Review**

20         Judicial review of an agency decision is governed by 5 U.S.C. § 706.  According to that

21  statute, a reviewing court shall set aside an agency action when such action is found to be

22  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

23  U.S.C. § 706(2)(A); Mt. St. Helens Mining and Recovery Ltd. P'ship v. U.S., 384 F.3d 721, 727

24  (9th Cir. 2004)(holding that it is "well established that once an agency has taken final agency

25  action under the APA, a reviewing court analyzes that decision under the arbitrary and

26  capricious standard of review").

27         According to the Ninth Circuit, "[u]nder the arbitrary and capricious standard, a

28  reviewing court must determine whether an agency's decision was based on a consideration

                                                7

1   of the relevant factors and whether there has been a clear error of judgment." <u>Mt. St. Helens</u>

2   <u>Mining and Recovery</u>, 384 F.3d at 728. This standard is narrow and a reviewing court may not

3   substitute its judgment for that of the agency. <u>Id.</u> "Applying the arbitrary and capricious

4   standard, this court must determine whether the agency articulated a rational connection

5   between the facts and the choice made." <u>Id.</u> (citing <u>Arizona Cattle Growers' Ass'n v. United</u>

6   <u>States Fish and Wildlife</u>, 273 F.3d 1229, 1236 (9th Cir. 2001)). A reviewing court will "overturn

7   an agency's decision only if the agency committed a 'clear error of judgment.'" <u>Id.</u>

8       In this case, the Court must decide if the IBLA made a clear error of judgment in

9   upholding a decision by the BLM which contracted the Fish Lake II Unit to the boundaries of

10  the Unit Participating Area and declared that the geothermal leases and portions of leases

11  thus excluded had expired. Geo-Energy contends that the IBLA decision is contrary to the

12  letter and spirit of the Geothermal Steam Act and is therefore "erroneous, arbitrary, capricious,

13  and, taken together with the BLM Decision, constitutes an abuse of discretion." (Motion for

14  Summary Judgment (#20) at p. 5). The Defendants contend that the IBLA decision should be

15  upheld because it complies with both the Unit Agreement and the applicable statutes and

16  regulations which govern geothermal leases.

17  **B.    Summary Judgment**

18      Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered

19  forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

20  together with the affidavits, if any, show that there is no genuine issue as to any material fact

21  and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

22  Summary judgment is "not warranted if a material issue of fact exists for trial." <u>Ribitzki v.</u>

23  <u>Canmar Reading & Bates</u>, 111 F.3d 658, 661–62 (9th Cir. 1997). A material fact is one that

24  "might affect the outcome of the suit under the governing law . . . ." <u>Lindahl v. Air France</u>, 930

25  F.2d 1434, 1436 (9th Cir. 1991) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248–49

26  (1986)). Further, any dispute regarding a material issue of fact must be genuine— the

27  evidence must be such that "a reasonable jury could return a verdict for the nonmoving party."

28  <u>Id.</u> Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for

    the nonmoving party, there is no genuine issue for trial" and summary judgment is proper.

8

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

2      The burden of proving the absence of a genuine issue of material fact lies with the
3  moving party; accordingly, "[t]he evidence of the opposing party is to be believed, and all
4  reasonable inferences that may be drawn from the facts placed before the court must be
5  drawn in the light most favorable to the nonmoving party." Id. (citing Liberty Lobby, 477 U.S.
6  at 255); Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir. 1998). Nevertheless,
7  if the moving party presents evidence that would call for judgment as a matter of law, then the
8  opposing party must show by specific facts the existence of a genuine issue for trial. Liberty
9  Lobby, 477 U.S. at 250; Fed. R. Civ. P. 56(e). To demonstrate a genuine issue of material
10  fact, the nonmoving party "must do more than simply show there is some metaphysical doubt
11  as to the material facts." Matsushita Elec. Indus., 475 U.S. at 586. "If the evidence [proffered
12  by the nonmoving party] is merely colorable, or is not significantly probative, summary
13  judgment may be granted." Liberty Lobby, 477 U.S. at 249–50.

14      When the parties file cross-motions for summary judgment, as in this case, the court
15  must consider each party's motion separately and determine whether that party is entitled to
16  a judgment under Rule 56. Western Land Exchange Project v. U.S. Bureau of Land Mgmt.,
17  315 F.Supp.2d 1068, 1075 (D. Nev. 2004). Cross-motions for summary judgment do not
18  necessarily mean that there are no disputed issues of material fact, and do not necessarily
19  permit the judge to render judgment in favor of one side or the other. Starsky v. Williams, 512
20  F.2d 109, 112 (9th Cir.1975). In making these determinations, the court must evaluate the
21  evidence offered in support of each cross-motion. Id. (citing Fair Housing Council of Riverside
22  County, Inc. v. Riverside Two, 249 F.3d 1132, 1136-37 (9th Cir. 2001)). Applying these
23  principles, the Court now turns to whether summary judgment is warranted in this case.

24      Both parties contend that they are entitled to summary judgment. Geo-Energy
25  contends that summary judgment should be entered overturning the IBLA decision because
26  such decision is inconsistent with and contravenes the governing law. Specifically, Geo-
27  Energy contends that the IBLA decision violates  30 U.S.C. § 1017 of the Steam Act. In
28  addition, Geo-Energy argues that the IBLA decision violates "the clear 35-year record of
congressional intent as to federal geothermal lease extensions for diligent, successful unitized

geothermal developers." (Motion for Summary Judgment (#20) at p. 17). Finally, Geo-Energy argues that its lease terms were successive as required by governing law and that the IBLA decision "ignores the fact that the lease terms of the Twelve Leases in this case exhibit an unbroken, consecutive straight line." Id. at pp. 24-25.

The Defendants, on the other hand, contend that they are entitled to summary judgment because "the IBLA determined that the Unit contraction was required by the terms of the Unit Agreement to which Geo-Energy was a party and that BLM had gone to extraordinary lengths to postpone the contraction to allow Geo-Energy the time to develop its lease interests or sell those lease interests to another operator." (Cross-Motion for Summary Judgment (#21/22) at p. 4). Further, the Defendants state that the "IBLA determined that the applicable regulations were clear and unambiguous to the effect that Geo-Energy, as lessee, was not eligible for additional lease extensions once the leases were outside the Unit." Id.

Geo-Energy has raised the following issues on appeal arguing that the IBLA's decision was arbitrary, capricious and an abuse of discretion.

1.   **Nullification of lease extensions prior to commerciality determination.**

In its appeal, Geo-Energy argues that once the twelve leases "were held in extended term by 'location' in the Fish Lake II Unit, after BLM's retroactive commerciality determination," those leases "were not in need of, nor under governing law eligible for, any second diligent efforts extensions from and after the December 1, 1993 effective date of BLM's commerciality determination." (Motion for Summary Judgment (#20) at pp. 15-16). As such, Geo-Energy contends that the "purported lease extensions issued by BLM for five of these leases on November 3, 1993, were effectively nullified by BLM by virtue of its retroactively effective commerciality determination to December 1, 1993." Id. Thus, according to Geo-Energy, the IBLA's decision was arbitrary and capricious because it held that the lease extensions granted under 30 U.S.C. § 1005(c) and (g) were valid and not nullified by placement in a unit.

The IBLA addressed the issue of whether lease extensions granted prior to the commerciality determination on lease N-9647 were nullified as a result of that determination and the placement of the five leases in a unit. (IBLA Decision at p. 12). The issue arose

1    because several of the leases were granted five-year extensions under various provisions of
2    the Steam Act and then later placed in a Unit which earned a 5-year extension because of well
3    No. 81-13.  As such, the argument before the IBLA was whether the 5-year extension granted
4    to the Unit because of the commerciality determination on lease N-9647 nullified the lease
5    extensions granted to the leases under 30 U.S.C. § 1005(c) and (g).  The IBLA stated that
6    "[t]he parties do not cite any statutory or regulatory authority to support their assumption that
7    the consequence of concurrent extensions is that one is rendered a legal nullity by the other,
8    and our examination of the Act, amendments, and legislative history reveals nothing that
9    states or suggest such a result."  Id.  As such, the IBLA held that "the diligent efforts
10   extensions in this case remained legally effective after unit commitment."  Id.

11   Upon review of this determination, this Court finds that the IBLA's decision is not
12   arbitrary or capricious and does not constitute a clear error of judgment.  As noted by the IBLA,
13   there is no authority in the Steam Act to uphold the argument that commitment to a unit
14   nullifies prior lease extensions.  As a result, even though the BLM changed the effective date
15   of the commerciality determination to December 1, 1993, that does not nullify extensions
16   legally granted prior to that determination.   As a result, the IBLA's decision is affirmed.

17        **2.    Successiveness of diligent efforts extensions.**
18

19   In its appeal to this Court, Geo-Energy argues that the IBLA's decision should be
20   overturned because that decision found that Geo-Energy's lease terms were not successive
21   for purposes of diligent efforts extensions under 30 U.S.C. § 1005.  Geo-Energy contends that
22   the lease terms for the twelve leases at issue in this matter "were in fact, and in time, and most
23   importantly as required by the governing law, 'successive.'" (Motion for Summary Judgment
24   (#20) at p. 24).  According to Geo-Energy, the fact that the leases were held in location by a
25   unit extension made the lease terms successive for purposes of 30 U.S.C. § 1005 even
26   though the lease terms were not successive diligent efforts extensions.  As such, according
27   to Geo-Energy, it should be entitled to a diligent effort extension under that provision.

28   30 U.S.C. § 1005(g) governs diligent effort extensions for geothermal leases.  Under
     30 U.S.C. § 1005(g) a geothermal lease may be "extended for successive 5-year periods."

1  Specifically, that statute provides:

> Any geothermal lease issued pursuant to this chapter for land on which, or for which under an approved cooperative or unit plan of development or operation, geothermal steam has not been produced or utilized in commercial quantities by the end of its primary term, or by the end of any extension provided by subsection (c) of this section, may be extended for successive 5-year periods, but totaling not more than 10 years, if the Secretary determines that the lessee has met the bona fide effort requirements of subsection (h) of this section . . .

The IBLA held that diligent efforts extensions must be successive. (IBLA Decision at p. 13). According to the IBLA, "[t]he Act itself authorizes extensions 'for successive 5-year periods, but totaling not more than 10 years.'" Id. (quoting 30 U.S.C. § 1005(g)(1) (2000)). The IBLA then went on to state that successive meant consecutive and cited various regulations that reinforced its finding that the extensions granted under 30 U.S.C. § 1005(g) must be successive. Finally, the IBLA stated that "[n]othing in the Act, as amended, or its legislative history confers discretionary authority on the Secretary to grant diligent efforts extensions on other than a 'successive' or consecutive basis." Id.

Because 30 U.S.C. § 1005(g) requires that diligent efforts extensions be successive, the IBLA's decision upholding the BLM's decision denying Geo-Energy's request for diligent efforts extensions is not arbitrary and capricious. The BLM denied Geo-Energy's diligent efforts extension request because it was not successive to its first diligent efforts extension. 30 U.S.C. § 1005(g) provides for a diligent effort extension and states that such extension must be "successive." Geo-Energy's diligent efforts extension requests were not successive as required by that statute. As such, the IBLA's decision is not a clear error of judgment and is affirmed.

### 3.   Congressional intent regarding lease extensions.

On appeal, Geo-Energy argues that the BLM's determination that the leases which were outside of the contracted unit had expired violated the letter and spirit of the Steam Act. The IBLA decision addressed Geo-Energy's specific argument that the "BLM's interpretation of the diligent efforts extension as precluding the granting of another extension at the point of elimination from the Unit is inconsistent with Congressional intent in enacting the 1988 Amendments." The IBLA determined that the BLM acted appropriately in refusing to grant

12

1  Geo-Energy lease extensions following contraction of the unit because there was no statutory

2  authority permitting an automatic extension for leases eliminated from a unit. In fact, the IBLA

3  stated that the lack of such a statutory mandate was an intentional omission by Congress on

4  that point, and, thus, Geo-Energy's argument was without merit. (IBLA Decision at p. 14).

5      30 U.S.C. § 1017 governs the creation and adoption of unit plans of agreement for the

6  development and operation of geothermal resources. It provides that once a unit plan is

7  adopted, the Secretary shall review such plan "[n]o more than five years after approval" of the

8  plan to determine whether certain leases or portions of leases should be eliminated.

9  Specifically, the statute states that the Secretary "after notice and opportunity for comment

10 [shall] eliminate from inclusion in such plan any lease or part of a lease not regarded as

11 reasonably necessary to cooperative or unit operations under the plan." Such "elimination

12 shall be based on scientific evidence." Significantly, that statute further provides that once

13 such a lease is eliminated, that lease "shall be eligible for an extension under subsection (c)

14 or (g) of section 1005." The statute does not provide that a lease eliminated from a unit is

15 automatically granted an extension.

16      When Congress passed the Steam Act, it recognized "that it was in the public interest

17 to enact federal law to create a legal framework to permit the development of geothermal

18 resources on federal lands." Wagner v. Chevron Oil Co., 321 F.Supp. 2d 1195, 1198 (D.Nev.

19 2004). Geo-Energy argues that in enacting the Steam Act, Congress created "multiple

20 provisions to help diligent successful geothermal lessees hold their unitized leases . . . by

21 diligent efforts extension if contracted from that unit." (Motion for Summary Judgment (#20)

22 at p. 15). However, the statutory framework of the Steam Act provides for specific lease

23 periods and extension requirements. Geo-Energy has failed to satisfy those requirements.

24 Specifically, when the Fish Lake II Unit was contracted, seven of the twelve leases had

25 completed one extension and were beyond the point when a successive extension could be

26 sought. The remaining five leases had already exhausted the two extensions they were

27 entitled to under 30 U.S.C. § 1005(g). Further, the language of 30 U.S.C. § 1017 makes it

28 clear that a lease eliminated from a unit needs to qualify independently for an extension or an

additional term. It does not provide an automatic extension. As such, the BLM's decision and

13

1   IBLA's decision were in accordance with the statutory provisions and regulations of the Steam
2   Act, and, thus, did not violate the congressional intent of the Act. Moreover, because the
3   IBLA decision was in accordance with the statutory provisions, such decision is not arbitrary
4   or capricious.

5       **4.    Applicability of 30 U.S.C. § 1017 scientific evidence requirement.**

6       On appeal, Geo-Energy argues that the IBLA's decision should be overturned because
7   the BLM made its decision in contravention of 30 U.S.C. § 1017. According to Geo-Energy,
8   the "BLM did not present any 'scientific evidence' whatsoever, either prior to or in the BLM
9   Decision, as the basis for that purported contraction of the Fish Lake II Unit, as required by the
10  1988 GSAA's amendment to Steam Act § 18 (30 USC § 1017)." (Motion for Summary
11  Judgment (#20) at p. 13). Geo-Energy contends that "BLM, by governing law, may only carry
12  out contraction/revision of a Federal geothermal unit based upon 'scientific evidence,' which
13  must be first presented for input, comment, and possible objection/revision by the Working
14  Interest Owners and Unit Operator." Id.
15

16      The Defendants argue that the BLM's decision complied with Article 4.3 of the Unit
17  Agreement and that Geo-Energy is "confusing 43 CFR § 3283 and 30 USC § 1017, both of
18  which pertain to Unit review and revision, with Unit contraction under Article 4.3 of the Unit
19  Agreement." (Cross-Motion for Summary Judgment (#21/22) at p. 23). According to the
20  Defendants, those provisions "do not apply to Unit contraction because the process for review
21  of a Unit to determine whether unnecessary lands should be eliminated from the Unit . . . is
22  separate and distinct from the process for Unit contraction." Id. As such, the Defendants
23  argue that the scientific evidence requirement of 30 U.S.C. § 1017 only applies when the unit
24  agreement is being reviewed and revised.

25      As noted in the foregoing, 30 U.S.C. § 1017 provides that "the Secretary shall review
26  each such plan and, after notice and opportunity for comment, eliminate from inclusion in such
27  plan any lease or part of a lease not regarded as reasonably necessary to cooperative or unit
28  operations under the plan." Further, that statute provides that "[s]uch elimination shall be
    based on scientific evidence." The Unit Agreement, on the other hand, states that unit area

1  lands not part of the Participating Area "shall be eliminated automatically" five years after the
2  initial Participating Area is established "unless diligent drilling operations are in progress." (AR
3  Vol III, Tab DL).

4  　　　As noted in the foregoing, the Unit Agreement is a contract which determines how the
5  Unit will be administered.  The Unit Agreement at issue in this case was executed by both
6  FLPC and Magma/Geo-83 JV.  Because it is a contractual agreement, it is separate and
7  distinct from the revision and elimination procedure established under 30 U.S.C. § 1017.
8  Further, that agreement does not require either scientific evidence or lessee concurrence prior
9  to contraction of the Unit.

10 　　　As such, Geo-Energy's argument that the BLM contracted the Unit without scientific
11 evidence or allowing for objection and comment is inapplicable to the contraction that occurred
12 in this case.  The BLM contracted the Unit in accordance with Article 4.3 of the Unit
13 Agreement.  The contraction under Article 4.3 of the Unit Agreement is separate and distinct
14 from the review and revision of 30 U.S.C. § 1017.
15
16 　　　Based on the foregoing, this Court affirms the IBLA's Decision upholding the May 12,
17 2003 decision by the BLM. This Court cannot substitute its judgment for that of the agency,
18 and based on a review of the administrative record and governing law, this Court holds that
19 the IBLA decision was neither arbitrary nor capricious.

20 **CONCLUSION**

21 　　　Based on the foregoing, IT IS ORDERED that Defendants' Cross-Motion for Summary
22 Judgment (#21/22), is GRANTED.

23 　　　IT IS FURTHER ORDERED that Geo-Energy's Motion for Summary Judgment (#20)
24 is DENIED.
25
　　　DATED: This 18th day of March, 2008.
26
27
28
　　　BRIAN SANDOVAL
　　　United States District Judge

15